## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Kristin Lawson, individually and on behalf of
all others similarly situated,

      Plaintiff,

          v.

Full Tilt Poker Ltd., Tiltware LLC, Vantage,
Ltd., Filco Ltd., Kolyma Corp. A.V.V.,
Pocket Kings, Ltd., Ranston Ltd., Mail Media
Ltd., Raymond Bitar, Howard Lederer,
Christopher Ferguson, Rafael Furst, and John
Does 1-10;

      Defendants.

Case No. 11-cv-06087 (LBS)

JURY TRIAL DEMANDED

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Kristin Lawson, on behalf of herself and all others similarly situated, brings this

action against Defendants (defined below).  Plaintiff bases this action upon the investigation of

Counsel as to publicly-available news reports, public filings in the United States and abroad,

press releases issued by the Department of Justice, Defendants' and other poker sites, and based

on personal knowledge as to allegations relating to Plaintiff.  Plaintiff also relies on the

Department of Justice's Amended Civil Complaint filed in the Southern District of New York on

Sept. 20, 2011 and the Department of Justice's Criminal Indictment. *See* DOJ Verified First

Amended Complaint, 11-Civ-2564 (LBS) (S.D.N.Y., Sept. 20, 2011) (attached herein at Exhibit

A) & Superseding Indictment ("DOJ Criminal Indictment"), 10-CR-336 (LAK) (S.D.N.Y., filed

under seal Mar. 10, 2011, unsealed Apr. 14, 2011) (attached herein at Exhibit B).

## SUMMARY OF ALLEGATIONS

1. Until April 15, 2011, Defendants collected money from U.S. resident poker "real-money" internet poker players to use for play on the Full Tilt Poker ("Full Tilt" or the "Company") internet poker site, located at http://www.fulltiltpoker.com.

2. In the decade prior, internet poker had taken off, attracting an estimated 15 million Americans to bet an estimated $30 billion per year online.  Starting in 1998, Planet Poker began providing a forum for online poker with real money, and was followed soon thereafter by upstarts Paradise Poker, Pacific Poker and others.  Beginning with the popularity of the World Poker Tour on television in 2002, television coverage of the game increased and resulted in a self-fulfilling prophecy of the game becoming more and more popular to Americans.  Following the World Series of Poker victory of amateur Chris Moneymaker in 2003, who had earned his entrance in the tournament at PokerStars.com, it was estimated that online poker volume increased 500%.  By 2004, it was estimated that the industry raked in profits of $1 billion.  The Wall Street Journal has estimated the online poker market in the United States to be worth $5 billion.

3. In 2006, the United States enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"), which made it a federal offense for gambling businesses to "knowingly accept" most forms of payment "in connection with the participation of another person in unlawful Internet gambling."  Due in part to uncertainty related to the passage of this act, U.S. banks began prohibiting poker businesses from opening bank accounts for purposes of engaging in internet gambling related transactions with U.S. customers.  Having difficulty accepting and processing payments from U.S. residents, some providers of online poker terminated their United States operations.

4.      Other online poker providers, including Defendants, subsequently devised and set into action a scheme by which they could deceive United States banks into once again processing gambling related transactions for United States based poker players, and deceive poker players themselves into funding their accounts.  Defendants utilized numerous complicit third-party entities to disguise the purpose of the transactions so that the banks would be deceived into processing these payments.  Because U.S. banks had ceased to extend credit for internet gambling purchases, defendants did not apply the required internet gambling transaction codes to their transfers.  Fake third parties with names like "Arrow Checks," "TLC Global," and Eastern Expressions" were established to process credit and eCheck transactions while eluding detection.

5.      As of 2011, Defendants' illicit scheme had been successful in luring U.S. based players to deposit real money to play poker with at Full Tilt Poker's website.  While, behind the scenes, Defendants deceptively utilized numerous illegal mechanisms to process players' transactions and enrich themselves, the players were neither aware of these deceits nor of their illegal nature.  In fact, Defendants promised that players' deposits would be "safe and secure" with Full Tilt.  One page specifically promised that "Full Tilt Poker works hard to ensure that playing for real money is easy, safe and secure by: . . . Providing a variety of safe and secure payment processors to make depositing money fast and easy; . . .Ensuring any money you have on deposit with Full Tilt Poker is completely safe and secure; and . . . Processing withdrawals quickly and efficiently."

6.      Based on such assurances, Full Tilt held approximately $150 million of players' money as of April of 2011.  Nonetheless, Full Tilt's promises were hollow, as players' money was commingled with Full Tilt's own funds, and were therefore not "safe and secure" as a result of Full Tilt's illegal activity.

7.     Besides simply commingling funds, players' funds were also unlawfully paid out to the Individual Defendants (defined below) in violation of Full Tilt's assurances.  Full Tilt Poker used player funds, among other things, to maintain a steady flow of payments to its owners, totaling more than $442 million over the last four years, despite the fact that Full Tilt Poker did not have sufficient funds to repay its players.  Specifically, Defendants Bitar, Lederer, Ferguson, and Furst ("the Individual Defendants") reportedly made off with over $100 million combined.  Transfers to Defendants' personal accounts, including accounts overseas, continued at a rate of approximately $10 million per month even up to the summer of 2010, when Full Tilt's management was aware that the company was having problems collecting funds from US banks.

8.     In spite of increasing awareness that the Company was having problems collecting funds and that the Company was insolvent, Defendants carefully maintained that players' funds were safe and secure, continued to operate their website, continued to market the Full Tilt brand online and at live poker events, and ultimately continued collecting money where possible from unsuspecting players.

9.     On April 15, 2011, the situation came to a head when the U.S. Attorney for the Southern District of New York seized the assets of the "Big Three" internet poker companies operating in the United States, including Full Tilt Poker, and arrest warrants were issued for the founders of these companies for, among other offenses, money laundering, conspiracy to commit wire fraud, and conspiracy to commit bank fraud.  At approximately the same time, the Department of Justice filed a civil suit against the three companies for money laundering and for *in rem* forfeiture of all assets and proceeds derived from the illegal acts in which these

companies allegedly engaged.  Due to Defendants' commingling of funds, this *in rem* procedure

encompassed approximately $150 million in players' funds.

10.     On September 20, 2011 the Department of Justice amended its civil suit to add

new allegations that Full Tilt and its owners allowed players to deposit, and play poker with,

phantom funds that Full Tilt knew, in many cases, would be impossible to collect from players'

bank accounts – in effect operating as a ponzi scheme – and that Full Tilt's owners, including the

Individual Defendants, continued at that time to pay out large amounts of players' money to

themselves.

11.     Since April 15, 2011, known as "Black Friday" in the poker industry, U.S. players

with Full Tilt Player Accounts have been wrongfully denied access to their own funds. No

legitimate explanation has been offered by Full Tilt for refusing to permit U.S. players to cash

out their accounts.

12.     In an April 20, 2011 press release, Manhattan U.S. Attorney Preet Bharara stated

that no individual player accounts were frozen by the United States, and that Full Tilt and other

poker providers have been at all times free to reimburse any player's deposited funds.

Nevertheless, in an effort to aid the return of funds with which Full Tilt was entrusted, the

Department of Justice entered into an explicit agreement with Full Tilt to facilitate the

repatriation of U.S. players' funds.  At the same time, the U.S. entered into a similar agreement

with PokerStars.  As stated by U.S. Attorney Bharara stated: "The agreements allow for

PokerStars and Full Tilt Poker to use the pokerstars.com and fulltiltpoker.com domain names to

facilitate the withdrawal of U.S. players' funds held in account with the companies."

13.     Nonetheless, while PokerStars has since allowed United States players to cash

out, Full Tilt has not followed suit.  Full Tilt has conceded its obligation to return players' funds,

stating "Please be assured that your funds are safe, and we thank you for your patience while we do everything in our power to have your money returned to you as soon as possible."  As Full Tilt knew when it made these statements, but did not disclose, in actuality Full Tilt owed over $390 million to players around the world, with only $60 million on deposit in its bank accounts. $150 million of that $390 million was owed to players in the United States.  To this date, Full Tilt has not returned players funds but has instead prevented them from access.

14.     Accordingly, Plaintiff, a United States player who had funds in her Full Tilt Poker player account on April 15, 2011 and was owed funds at that time, brings this action on behalf of herself and all others similarly situated to seek the return of their funds.  Plaintiff brings this action against Defendants under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1964 (c) based on their conduct in engaging in a criminal enterprise in violation of 18 U.S.C. § 1962 (c) and (d) and committing the predicate acts of mail fraud, wire fraud, and money laundering, and failing to return players' wrongfully retained funds.  Plaintiff also brings a conversion claim.  Plaintiff seeks the return of her funds, as well as all other remedies allowable by law including treble damages, interest and attorneys' fees.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964(a) and (c) and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because Plaintiff alleges a cause of action under the Federal RICO statute and because Class members are of diverse citizenship from one or more Defendants, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,0000.

16.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants engaged in substantial conduct relevant to Plaintiff's claims within this District and have caused harm to Plaintiff and Class members residing within this District.

**PARTIES**

17.     Plaintiff Kristin Lawson ("Ms. Lawson") is an individual residing in Shafer, Minnesota.  Ms. Lawson entered into an agreement with Full Tilt in 2005, and played internet poker in Full Tilt card rooms until April 15, 2011.  On April 15, 2011, Ms. Lawson maintained a Player Account with Full Tilt that contained a balance of funds.  As just one example, Ms. Lawson deposited approximately $600 in her player account in June of 2008.  Since April 15, 2011, Ms. Lawson has been denied access to her account and the funds therein that are rightfully owed to her.

18.     Defendant Full Tilt Poker Ltd. is the corporate entity with which the members of the Full Tilt team have contracted. Full Tilt Poker Ltd. is a RICO Defendant, a member of the Enterprise (defined below in RICO allegations) and has participated in or directed the conduct of the Enterprise in aid of its illegal acts.

19.     Defendant Tiltware LLC ("Tiltware") is a corporate entity headquartered in California.  Tiltware is the exclusive poker software developer and licensor for Full Tilt.  Tiltware is also the Full Tilt marketing wing.  As Full Tilt's marketing wing, Tiltware LLC, helped to create and disseminate false statements made to Plaintiff and the Class regarding the "safety and security" of players' funds.  Tiltware is a RICO Defendant, a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts.  Tiltware is the parent company, and beneficial owner, of Pocket Kings Ltd., Filco Ltd., and other Full Tilt Companies.  The following Individual Defendants owned the following

approximate percentages of Tiltware LLC: Bitar (7.8%), Lederer (8.6%), Ferguson (19.2%), and Furst (2.6%). Moreover, these individuals were also, at all relevant times, members of the Board of Directors of Tiltware LLC, and Ferguson was Chairman of the Board of Directors. At all relevant times, Bitar and Lederer were the two managing members of Tiltware LLC. Bitar, Lederer, Ferguson, and Furst, together and with the other owners, through their ownership and control over Tiltware LLC, the marketing wing of Full Tilt, utilized Tiltware as the mechanism to redirect players' funds for their own personal use.

20.     Defendant Vantage, Ltd. ("Vantage") is a corporate entity headquartered in Alderney, in the Channel Islands. Vantage is the entity with which users of the Full Tilt website, including users based in North America, enter into an "End User License Agreement." Vantage owns Swiss bank accounts that contain players' funds. Vantage is a RICO Defendant, a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts. Vantage, operating under the Full Tilt Poker brand name, was a licensee of the Alderney Gambling Control Commission until its license was revoked on June 29, 2011. Previously, by virtue of its license, Vantage, dba Full Tilt.com, was permitted to register new customers, accept deposits from new and existing customers, permit withdrawal of funds by existing customers and permit participation by customers in gambling transactions and game play.

21.     Defendant Filco Ltd. ("Filco") is a corporate entity that previously held the "eGambling" license issued by the Alderney Gambling Control Commission. Filco is a RICO Defendant, a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts. Filco is explicitly named in Pocket Kings Ltd. documents as a related company to Pocket Kings Ltd., among others, and Filco's corporate parent is Tiltware. As

a licensee of the Alderney Gambling Control Commission, Filco was licensed, on behalf of Full Tilt Poker, to register new customers, accept deposits from new and existing customers, permit withdrawal of funds by existing customers and permit participation by customers in gambling transactions and game play.

22.     Defendant Kolyma Corporation A.V.V. ("Kolyma") is an Aruba Exempt Company with limited liability.  By virtue of its formation as an "A.V.V." company, Kolmya is eligible for certain exemptions from profit and dividend withholding tax.  Kolyma is a RICO Defendant, a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts.  Kolyma is the legal owner of the Full Tilt website.

23.     Defendant Pocket Kings Ltd. ("Pocket Kings") is a corporate entity headquartered in Ireland.  Pocket Kings is responsible for operating the Full Tilt website.  Pocket Kings has at all or some relevant time(s) provided "[t]echnology and [m]arketing consulting services to the online poker industry and one of the fastest growing poker sites, Full Tilt Poker."  Pocket Kings is a RICO Defendant, a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts.  Pocket Kings' parent company is Tiltware.  Pocket Kings is a "related company" to, *inter alia,* Filco Ltd., and Pocket Kings Consulting Ltd.

24.     Defendant Ranston Ltd. ("Ranston") is a corporate entity in whose name Full Tilt Poker funds are held in Switzerland.  Ranston is a RICO Defendant, a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts.

25.     Defendant Mail Media Ltd**.** ("Mail Media") is a corporate entity in whose name Full Tilt funds are held in Switzerland.  Mail Media is a RICO Defendant, a member of the Enterprise and has participated in or directed the conduct of the Enterprise in aid of its illegal acts.

26.     Defendant Raymond Bitar ("Bitar") is an individual residing in the State of California and a member of the Enterprise.  Bitar is, and at relevant times has been, a shareholder and director of Full Tilt and/or one or more Full Tilt Companies.  Bitar is and/or has been CEO of Tiltware LLC since its founding in 2003 and Bitar is one of only two directors of Tiltware LLC.  A warrant for Bitar's arrest was issued in connection with the Department of Justice's ongoing prosecution of racketeering activity by individuals associated with Full Tilt on April 15, 2011.  Since that date, Bitar, a U.S. resident, has not returned to the United States.  Defendant Bitar personally received approximately $41 million from Full Tilt, including approximately $34,454,781.53 in ownership distributions and at least $6.5 million in "profit sharing" payments.

27.     Defendant Howard Lederer ("Lederer") is an individual residing in the State of Nevada, and a member of the Enterprise. He is and was, at relevant times, a shareholder and director of, and/or a participant in, one or more entities operating under the Full Tilt umbrella "Full Tilt companies"). Lederer, a professional poker player himself, is a member of Team Full Tilt and represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch. Lederer is also a founder and creator of the Full Tilt Poker site and brand, and is and/or was President of Tiltware LLC, the software developer and licensor of the proprietary Full Tilt Poker software, as well as the marketing wing of Full Tilt.  Defendant Lederer personally received approximately $42 million from Full Tilt, including approximately $37,856,010.92 in ownership distributions and at least $4 million in "profit sharing" payments.

28.     Defendant Christopher Ferguson ("Ferguson") is an individual residing in the State of California and a member of the Enterprise. Ferguson is and has been, at all or some relevant time(s), a shareholder and director of, and/or a participant in, Full Tilt and/or one or

more Full Tilt Companies. Ferguson is a founder of the Full Tilt site and brand and, a professional poker player himself, is a member of Team Full Tilt. As a member of the Team, Ferguson represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch.   Defendant Ferguson personally was allocated approximately $85,161,305.88 in distributions.  Company records reflect that approximately $25 million of this sum was actually transferred to Ferguson's personal accounts, with remaining balances characterized as "owed" to Ferguson.

29.     Defendant Rafael Furst ("Furst") is an individual residing in the State of California and a member of the Enterprise.  Furst is and has been, at all or some relevant time(s), a shareholder and director of, and/or a participant in, Full Tilt and/or one or more Full Tilt Companies.  Furst, as a professional poker player himself, is a member of Team Full Tilt. As a member of the Team, Furst represents the Full Tilt brand in poker-related events all over the world, wearing clothing and accessories that bear the easily recognizable Full Tilt Poker patch. Defendant Furst personally was allocated approximately $11,706,323.96 in distributions. Company records reflect that at least a portion of this sum was actually transferred to an overseas account.

30.     Defendant John Does, 1-10 ("John Doe(s)") are unknown entities and/or persons associated with Full Tilt and/or Full Tilt Companies.  Once the identities of these persons and entities are ascertained, Plaintiff will seek leave to join them under their true names.

31.     Bitar, Lederer, Ferguson, & Furst are the "Individual Defendants."  Plaintiff expects that after appropriate discovery is conducted, one or more of Individual Defendants may also be named as RICO Defendants.  Full Tilt Poker Ltd., Tiltware LLC, Vantage, Ltd., Filco Ltd., Kolyma Corp. A.V.V., Pocket Kings, Ltd., Ranston Ltd., and Mail Media Ltd. are the

RICO Defendants.  The Individual Defendants, together with the RICO Defendants, are the "Defendants."

32.     Personal jurisdiction exists over the Individual Defendants under N.Y. C.P.L.R. § 302(a) (New York's "long arm statute"), via F.R.C.P. 4(k)(I)(A).  Each Individual Defendant has committed a tortious act causing injury to person or property in New York, and should have reasonably expected the act to have consequences in the state and derives substantial revenue from interstate or international commerce.  Each Individual Defendant personally participated in the tortious acts based on the fact that each personally received millions in funds, whether characterized as "ownership distributions," "profit sharing" payments, loans, or other unlawful transfers, that, as they knew and/or reasonably should have known, rightfully belonged to class members.  Absent the looting of the company, Full Tilt would have been able to return player funds under its agreement with the Department of Justice.  Each Defendant should reasonably have expected these transfers to be unlawful and to have consequences in New York and nationwide by virtue of their status as Full Tilt Poker insiders and their concomitant knowledge of Full Tilt's nationwide presence and increasingly dire financial situation.

**CLASS ACTION ALLEGATIONS**

33.     This action has been brought, and may properly be maintained, under Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(l) and (b)(3).

34.     Plaintiff brings this action as a class action on behalf of herself and all others similarly situated as members of a Class defined as follows: "**all U.S. residents who, on April 15, 2011, held real-money Full Tilt Poker Player Accounts and who were owed money by Full Tilt.**" (the "Class").  Excluded from the proposed Class are: any entity which any Defendant

has a controlling interest; any of Defendants' officers, directors, or employees; and the legal

representatives, heirs, successors, and assigns of any Defendant..

35.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the

Class because:

a)     ***Numerosity.*** The members of the Class are so numerous and widely dispersed that

joinder of all members in one action is impracticable. The precise number of Class members is

unknown to Plaintiff at this time, but the Class likely numbers in the thousands since Defendants

ran one of the most successful poker sites on the internet.  Plaintiff believes that there are many

thousands of US poker players who held accounts with Full Tilt on April 15th, 2011.

b)     ***Common Questions of Law and Fact.*** Common questions of law and fact exist as

to all members of the Class and predominate over any questions affecting solely individual

members of the Class. These common contentions, the determinations of which will resolve

issues central to the validity of each Class members' claim, include the following:

> i.   whether the Defendants are "persons" for purposes of the RICO statute,
>      that were employed by or associated with an interstate enterprise;
>
> ii.  whether an enterprise affecting interstate commerce existed;
>
> iii. whether Defendants were each employed by or associated with the
>      enterprise;
>
> iv.  whether Defendants participated in the conduct or affairs of the enterprise;
>
> v.   whether Defendants participated through a pattern of racketeering activity;
>
> vi.  whether Defendants held interest in, or control of, the alleged enterprise;
>
> vii. whether Defendants conspired to commit or committed bank fraud, in
>      violation of 18 USC §1344;

    viii.  whether Defendants conspired to commit or committed wire fraud, in violation of 18 USC §1343;

    ix.  whether Defendants' alleged actions constitute a pattern of racketeering activities;

    x.  Whether injuries to Plaintiff's business or property were sustained by reason of the Defendants' activities in violation of 18 USC §1962.

    xi.  Whether Defendants converted player funds;

    c)  *Typicality*. Plaintiff's claims are typical of the claims of the Class members because all U.S. holders of Full Tilt accounts have been wrongfully denied access to the property held in those accounts.

    d)  *Adequacy*. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent.  Plaintiff has retained competent counsel experienced in class actions, complex litigation, and RICO litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.    Class action status in this action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

37.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## FACTUAL BACKGROUND AND DESCRIPTION OF ACTION

38.     "Full Tilt" is the umbrella name for the Enterprise and brand name by which a number of privately held companies and other ventures, the "Full Tilt Companies," do business in the United States.  The RICO defendants and the Full Tilt Companies formed an informal Enterprise which conspired to – and did – illegally acquire and channel the money of U.S. online poker players.

39.     The primary end of the Enterprise was an online poker venture where players could gamble real money.  Players accessed Full Tilt's online card rooms via the Full Tilt software, which was available for free download from FullTiltPoker.com.  This online gambling product was launched, directed, and managed by the members of the Full Tilt Enterprise, working in concert.

40.     Full Tilt engaged in an intense, concerted marketing effort aimed at inducing U.S. citizens, including residents of New York, to download the Full Tilt Poker software, and open and fund real money accounts.  These efforts included:

a)   Solicitation through internet advertisements and links

b)   Television ads purchased on channels received by thousands of New York residents

c)   Sponsorship of high-stakes games televised to residents of New York

d)   Obtaining personal contact information, including bank account information, from New York poker players through the internet

e)   Contracting with internet poker players from New York regarding the Full Tilt software the players downloaded

15

    f)   Maintaining player accounts for all U.S. players, including those from New York, and providing access to those accounts

    g)   Sponsoring celebrity poker professionals to wear Full Tilt branded apparel during televised matches, which were shown in New York

41.    Many companies and individuals within Full Tilt conspired to obtain and unlawfully process the funds of U.S. poker players.  These entities shared the common purpose of maintaining Full Tilt's position in the U.S. market by enabling and participating in transactions with U.S. players.  The Defendants steered Full Tilt to illegally and deceptively accept and process deposits from U.S. players, via wire fraud, bank fraud, and money laundering. The Defendants commingled players' funds and transferred these funds to themselves for their own personal use.  The members of the Full Tilt Enterprise include:

    a)   The Full Tilt team of professional poker players who own and in part direct the activities of Full Tilt;

    b)   Tiltware, the exclusive poker software developer and licensor for Full Tilt, as well as its marketing wing, which is or has been headquartered in California;

    c)   Vantage, the company registered in Alderney with which players of Full Tilt Poker entered into the "End User License Agreement."  Vantage is also the holder of Full Tilt funds in a Swiss bank account.

    d)   Filco, the company holding the "eGambling" license issued by the Alderney Gambling Control Commission;

    e)   Kolyma, the Aruban financial services limited liability company that is eligible for exemptions from profit and dividend withholding tax, subject to limitations;

f) Pocket Kings, the Irish company which "operates" the site, providing "technology and marketing services";

g) Ranston, in whose name certain Full Tilt funds are held in Switzerland;

h) Mail Media, in whose name certain Full Tilt fund are held in Switzerland;

i) Full Tilt Poker Ltd, an apparent alternate name associated with the enterprise.

42.     These entities, on information and belief, conspired with the Defendants during the time relevant to this complaint.  The specifics of the interconnections between these entities are fully known only to Defendants and can only be revealed through appropriate discovery.

43.     The RICO Defendants conspired to commit and did commit wire fraud, bank fraud, money laundering, and other state and federal offenses for the benefit of and in the name of Full Tilt and its owners.

44.     Profits from the Full Tilt Poker website and software, player deposits, licensing fees, etc, were distributed among the Defendants and the above-named companies in a manner that can only be revealed through appropriate discovery.  Hundreds of millions of dollars in players' funds were transferred to Defendants for their own use.

45.     American poker players kept significant funds in their Full Tilt accounts.  Players were able to deposit funds in any of four methods:

a) Instant eChecks – players could use the Automated Clearinghouse system ("ACH"), an electronic network administered by the Federal Reserve, to transfer funds between their U.S. bank accounts and their Full Tilt accounts using "eChecks".

b) Visa and Mastercard – players could use their ATM, credit, debit or check cards to transfer funds into their Full Tilt accounts.

c) Click2Pay – players could transfer funds from their German, Swiss, or Austrian bank accounts (or credit cards) into their Full Tilt accounts.

d) Cash Transfer – Full Tilt advertised that American players could "walk into more than 100,000 convenient locations (such as banks, convenience stores, and markets) and transfer cash in person."

46.     Withdrawal of the funds was straightforward, most often involving clicking a prominent button within the software that read "cashier" and selecting an amount and method of withdrawal.  This credited the player's bank account or credit card.

## FULL TILT'S FRAUDS

### A.  BANK FRAUD

47.     The Unlawful Internet Gambling Enforcement Act, passed in 2006, made it illegal under federal law for a business to knowingly accept most forms of payment "in connection with the participation of another person in unlawful internet gambling."  While many internet poker providers left the U.S. market upon passage of the UIGEA, Full Tilt did not.

48.     After the UIGEA was passed, banks became increasingly vigilant against opening accounts and processing payments for internet gambling companies.  Rather than retreat from its largest market, Full Tilt engaged in a series of frauds to circumvent the UIGEA and deceive banks in order to maintain and expand their U.S. business. Full Tilt created sham businesses and websites, lied to both their players and their banks, and made millions of dollars in illegal profits as a result.

49.     Full Tilt specifically lied to their American players about:

a) The risks of keeping funds in a Full Tilt account;

b) How their funds were being handled on deposit;

c) Full Tilt's relationship with "third party" "independent" processors;

    d)  Full Tilt's creation of fake companies and websites used to deceive U.S. banks into processing their transactions;

    e)  Full Tilt's noncompliance with bank regulations;

    f)  The use of offshore bank accounts in the name of the fake merchants they created; and

    g)  The creation and use of U.S. bank accounts under the same false pretenses.

## B.  CREDIT CARD FRAUD

50.  In or around 2001, Visa and Mastercard began requiring that internet gambling providers use a particular transaction code for internet gambling transactions.  The purpose of this requirement was so the card issuer could identify those transactions and choose whether to approve or deny them.

51.  A 2002 Government Accountability Office (GAO) report explains that by that time most credit card issuers had chosen to block internet gambling transactions.  GAO Report, Internet Gambling 20 (Dec. 2002).

52.  As the credit card issuers ceased processing their transactions, Full Tilt responded with deception and fraud in order to maintain their share of the enormous U.S. market.

53.  One method by which Full Tilt deceptively circumvented the requirements of the credit card companies was to pay third-party payment processors to lie to the issuers and banks about the nature of the online gambling transactions.  As alleged in more detail in the DOJ complaint against, *inter alia*, Raymond Bitar and Nelson Burtnick, Full Tilt directed their third-party payment processors to apply incorrect codes (or no codes) to their transactions in order to hide the nature of the transactions.

54.     Another means by which Full Tilt defrauded the banks and credit card issuers was to set up fake companies to process Visa and Mastercard transactions for them.  These companies were deliberately named and positioned so as not to arouse suspicion.  Companies with names like "Arrow Checks," "TLC Global," and "Eastern Expressions" processed thousands of internet gambling transactions without the appropriate codes.  Each of these transactions constitutes a wire fraud and a predicate act.

## C.  ECHECK FRAUD

55.     An eCheck is an electronic funds transfer to and from U.S. bank accounts.  These are processed through the Automated Clearinghouse ("ACH") which is administered by the Federal Reserve.  The UIGEA prevented Full Tilt from opening U.S. bank accounts, which were necessary for eCheck processing.  Full Tilt responded in a familiar pattern of deception and fraud.

56.     Defendant Bitar and other members of Full Tilt engaged third party processors to fraudulently process eCheck transactions for Full Tilt.  Those eCheck processors lied about the nature of the transactions to the banks, representing that the eCheck transactions were for legitimate e-commerce purposes and not for illegal internet gambling

57.     Full Tilt conspired to create phony companies, even going so far as to put up fake websites for their innocuously-named front organizations, in order to deceive any bank investigators into believing the eCheck transactions were for legitimate e-commerce purposes.  This systematic and egregious fraud was perpetrated by Full Tilt to keep eCheck processing available for their U.S. players.

## D.  DEFRAUDING THE PLAYERS

58.     Full Tilt went to these fraudulent lengths in order to continue making millions in illegal profit from U.S. online poker players.

59.     Full Tilt went to lengths to represent to their U.S. players that playing online poker for real money at Full Tilt was legitimate and legal.  Full Tilt's website represented to players that money in their Full Tilt accounts would be "safe and secure."

60.     Specifically, the webpage stated:

> If you're looking to get the most out of your online poker experience, Full Tilt Poker offers a wide selection of real money ring games and tournaments for your enjoyment.  What's more, Full Tilt Poker works hard to ensure that playing for real money is safe, easy, and secure by:
>
> - Providing a variety of safe and secure payment processors to make depositing money fast and easy.
> - Ensuring any money you have on deposit with Full Tilt Poker is safe and secure.
> - Protecting your valuable personal information.
> - Processing withdrawals quickly and efficiently.

These were lies.  The payment processors were anything but safe and secure, as they were fake companies established in pursuit of this fraudulent scheme.  The funds held in player accounts were not safe and secure – they were part of Full Tilt's money laundering scheme, were commingled with company funds, and were paid out to owners including the Individual Defendants.  Finally, withdrawal of funds has been anything but quick and efficient for Plaintiff and the class she represents, as since April 15, 2011 Plaintiff and class members have been frozen out of their accounts.

61.     Plaintiff reviewed Full Tilt's website, and relied on Full Tilt's statements therein about the safety and security of her funds.  But for Full Tilt's representations that players' funds would be "safe and secure," Plaintiff would not have provided her funds to Full Tilt.

62.     Another Full Tilt webpage, entitled "Security", stated:

> Full Tilt Poker conducts their banking and financial affairs in accordance with generally accepted standards of internationally recognized banking institutions. Full Tilt Poker follows and adheres to applicable laws pertaining to transaction reporting and anti-money laundering laws and regulations.

These lies falsely proclaim to U.S. players that Full Tilt is a trustworthy handler of their funds and conceals the great risks actually taken by the U.S. players in leaving their funds deposited with Full Tilt.

63.     Plaintiff reviewed Full Tilt's website, and relied on Full Tilt's statements therein about Full Tilt's compliance with generally accepted standards of internationally recognized banking institutions.  But for Full Tilt's representations that it followed and adhered to applicable laws when collecting and maintaining players' funds, Plaintiff would not have provided her funds to Full Tilt.

64.     Further, in or about March of 2008, Defendants Bitar and Lederer advised a Full Tilt Poker employee that Full Tilt Poker could represent to players that Full Tilt Poker kept all of its player funds in segregated accounts and that funds would be available for withdrawal by players at all times.  Subsequently, and based in part on this information, Full Tilt Poker created several form e-mail templates to be used by Full Tilt Poker to respond to player inquiries about the security of their funds.

65.    For example: On or about May 6, 2008, Full Tilt Poker created a form e-mail which its staff then e-mailed to players, including players in the United States, in response to inquires from customers as to whether player funds were protected. The form e-mail stated, in relevant part:

> Thank you for contacting Full Tilt Poker Support.
>
> We do understand your concern about the safety of the funds in your Full Tilt Poker account. You raise a valid and commonly-asked question, and we would like to assure you that your funds are completely safe on Full Tilt Poker.... Our players' funds are kept in several deposit accounts throughout the world, all of which are separate and distinct from our operating accounts. With every hand dealt on Full Tilt Poker, commission is accumulated in these deposit accounts and transferred from the players' deposit accounts to Full Tilt Poker's operating accounts only after we have earned them. This is not done each time we earn rake or even daily, but as our earnings accumulate we make periodic transfers of those earnings from the deposit accounts to our operating accounts, from which we then pay outside expenses, Full Tilt Poker employees, and ultimately the shareholders of the company. Full Tilt Poker is not in any financial difficulty whatsoever and does not anticipate any. In fact, we are doing quite well. We would also like to add that you are always welcome to withdraw some or all of your funds if you feel uncomfortable. Our business depends on ensuring that your funds are available to you 24 hours a day, 7 days a week, and 365 days a year. That said, we would like to

> assure you that your money is not at all at risk and there is no poker site on
> the Internet where your money would be any safer than at Full Tilt Poker.

66.     On or about May 23, 2008, Full Tilt Poker created a second e-mail template that its staff then e-mailed to players, including players in the United States, in response to inquires as to whether player funds were protected. This form email stated, in relevant part:

> Thank you for contacting Full Tilt Poker Support. It is important to us that your account funds are secure and available to you at all times. To protect both our players and business from financial problems, all player account funds are segregated and held separately from our operating accounts. Unlike some companies in our industry, we completely understand and accept that your account money belongs to you, not Full Tilt Poker. Your account funds are available to you 24 hours a day, 7 days a week, 365 days a year. All withdrawals are processed upon completion of a review for fraudulent activity and usually within 48 hours.

67.     On various occasions from 2008 through 2010, Full Tilt Poker suffered publicly reported problems with its payment processors, prompting players to question whether their accounts with Full Tilt Poker were safe.  Full Tilt Poker representatives responded by posting statements on the Poker Forum assuring players that their funds were secure. For example, on June 9, 2009, in response to a thread on the Poker Forum entitled "Online poker seizure made front page of Yahoo finance," in which users expressed concern about their Full Tilt Poker accounts, "FTPDoug" wrote the following post:

> Understandably, many of you have concerns regarding certain bank accounts with poker players' money being frozen in the US, and I'd just

like to reassure everyone that your funds remain safe and secure at FTP,

and the processing of withdrawal requests is proceeding as normal and is

still available to all of our players. . . . We always make sure we can cash

out any of our players at any time. You should never have to worry that

you won't get your money. . . . .

68.     The result of all this fraud was directly harmful to the U.S. players, including

Plaintiff and the class she seeks to represent.  The banking, credit card, and eChecks frauds

described above were intentional, designed and implemented to keep the illicit profits from Full

Tilt's illegal U.S. online gambling operation flowing.  Full Tilt, and its owners including the

Individual Defendants, made millions in illicit profit while its players bore all the risk of losing

their funds in this fraudulent scheme.  When Full Tilt was ultimately investigated, indicted, and

their remaining assets seized, Full Tilt ended players' access to their funds, rather than returning

it.

69.     Even after Full Tilt and the Defendants became aware that the company was

having problem processing deposits to player accounts, they exacerbated the problem by

continuing to "credit" player accounts even though they were unable to collect the money from

players' back accounts.

70.     Beginning in or around August 2010, Full Tilt Poker was often unable to find

payment processors to withdraw funds from the bank accounts of its United States players.  From

this time, Full Tilt developed a shortfall of approximately $130 million owed to players.  The

management of Full Tilt Poker, including the Individual Defendants, operated Full Tilt Poker

with the hope that only a small number of players would try to withdraw funds at one time, and

that Full Tilt Poker would regularly receive additional deposits in amounts greater than any withdrawal requests.

71.     Despite the fact that, by early 2011, Full Tilt Poker was severely insolvent, it continued making payments of approximately $10 million per month to its owners up to and including April 1, 2011.  Full Tilt Poker also continued making "loans" to professional poker players who also owned an interest in the company.

72.     The ultimate "run on the bank" occurred on April 15, 2011, Black Friday.

73.     At that time, Although Full Tilt's website, profits, and several bank accounts were seized by the U.S. Attorney for the Southern District of New York on that date, the Department of Justice has not sought forfeiture of U.S. players' funds and, to the contrary, has expressed its expectation that such funds will be returned to the players.  While PokerStars, the other leading U.S. online poker company who was indicted at the same time, has returned funds to its players, Full Tilt still has not.  No legitimate explanation has been offered by Full Tilt for refusing to reimburse the players.

74.     On April 15, 2011, Full Tilt Poker terminated its United States operations.  Full Tilt Poker continued, however, to operate its online gambling business outside of the United States and continued to collect deposits from non-U.S. players.  Full Tilt Poker continued accepting player funds despite the fact that it had liabilities to players around the world for over $300 million, yet held only a small fraction of that amount in its bank accounts.  In spite of this, in early June, 2011, Lederer reported to the other owners of Full Tilt, that there was only $6 million left.

75.     Full Tilt's CEO, Bitar, was well aware of the need for new deposits after April 15, 2011, and knew that even a few million dollars' of unexpected withdrawals could reveal Full Tilt

Poker's true financial situation.  In an internal email dated June 12, 2011, Bitar expressed concern that a company announcement regarding lay offs and the Board of Directors (including himself and other Individual Defendants) being replaced would be seen as bad news, which would cause a "new run on the bank," adding that "it could be a huge run" and that "at this point we can't even take a five million run."

76.     Hence, Full Tilt Poker never disclosed the fact that it had no ability to return funds to these new depositors if they requested money back.  Instead, Full Tilt Poker allowed players to believe that its international business was separate from, and unaffected by, its now-defunct United States operations.

77.     Days after the seizure, on April 20, 2011, Preet Bharara, the U.S. Attorney who initiated the action, stated that individual player accounts had not been frozen and that Full Tilt had been at all times free to return to any player their deposited funds.  However, Bharara went even further, unlocking the seized domain names, including fulltiltpoker.com, in order to facilitate the return of players' funds. Despite the stated expectation of the DOJ that the funds be returned and concessions made to facilitate that return, Full Tilt has not provided Plaintiff and the class.  This is at least partly a direct result of the fact that Full Tilt was insolvent even before that date, having operated as a Ponzi scheme and having already transferred millions of dollars to the Individual Defendants for their personal use.

78.     On June 29, 2011, the Alderney Gambling Control Commission, which licensed Full Tilt and controlled the computer servers allowing gameplay, suspended the company's operations and halted Full Tilt's ability to operate in any jurisdiction.

79.     As late as September 19, 2011, Full Tilt Poker's website still stated that players' funds were "safe and secure."

## THE ENTERPRISE'S WRONGDOING

80.     The Full Tilt Enterprise, including the RICO defendants and affiliated third party entities, conspired in a broad scheme to defraud and deceive U.S. banks and financial institutions, the Federal Reserve, Plaintiff, and the class about the nature of their business. Absent this fraud, Full Tilt could not have maintained their U.S. internet gambling venture, which made them millions of dollars in profits.  To effect the scheme, Defendants:

   a)  Accepted credit and the proceeds of credit, electronic fund transfers and the proceeds of electronic fund transfers, checks, drafts and similar instruments, in connection with illegal gambling, in contravention of the UIGEA;

   b)  Conspired to and did commit bank fraud, with the object of executing a scheme to defraud financial institutions, to obtain monies, funds, credits and other assets by means of false and fraudulent pretenses and representations;

   c)  Conspired to and did commit wire fraud, with the object of communicating and obtaining the ill-gotten gains through communication in interstate and foreign commerce, including a scheme involving wire communications to deceive financial institutions into processing and authorizing payments to and from one or more member entities;

   d)  Conspired to and did commit wire fraud, with the object of communicating and obtaining the ill-gotten gains through communication in interstate and foreign commerce, including a scheme involving wire communications to deceive United States Poker players into funding player accounts via representations that player funds were "Safe and Secure" while in actuality the funds were anything but.  *See* ¶¶ 60-68.

e) Conspired to transport and/or transmit, and transporting and/or transmitting, monetary instruments and funds from a place in the U.S. to a place in the U.S. through a place outside of the U.S., with the intention of promoting the carrying on of specified unlawful activity;

f) Conspired to engage, and engaging, in monetary transactions in criminally-derived property of a value greater than $10,000.

81.    As a result of Defendants' fraudulent scheme, Plaintiff and class members have suffered damages in the amount of approximately $150 million, the amount in their Full Tilt accounts to which they have not had access since the April 15 indictment and seizure.

82.    Full Tilt's obtaining of Plaintiff's and the Class' funds is the direct and proximate result of Full Tilt's illegal racketeering activities, because in the absence of such activities, *inter alia*, Plaintiff would not have provided her funds to Full Tilt, no depositing transactions (via eCheck, third party U.S. bank transfer, or credit card) would have been approved by financial institutions, and thus no plaintiff funds would have been paid to and thus held by Full Tilt. But for Full Tilt's representations that players' funds would be "safe and secure," Plaintiff would not have provided her funds to Full Tilt.

83.    Full Tilt's racketeering activity, including violation of the wire fraud statute, is the proximate cause of Plaintiff's injury. Even absent the Department of Justice's activities on Black Friday, Plaintiff's funds were not "safe and secure" as Defendants had represented via their website and other communications to the public. While, as of March 31, 2011, Full Tilt Poker owed approximately $390 million to players around the world, including approximately $150 million to United States players, Full Tilt Poker had only approximately $60 million on deposit in its bank accounts at that time. Thus, even after the government allowed Full Tilt

Poker to return players' funds via its website (after the initial shutdown), there were not enough

funds to make players whole.  The looting of these funds by members of the Enterprise, via wire

fraud, bank fraud, and money laundering violations, is the proximate cause, indeed the only true

cause, of Plaintiff's injuries.  The government shutdown was a temporary occurrence that merely

alerted Plaintiff to Full Tilt's underlying problems.

## THE INDIVIDUAL DEFENDANTS' WRONGDOING

84.     Each of the Individual Defendants named herein participated directly in the

unlawful acts described in this Complaint.

85.     At all relevant times, Defendants Bitar, Lederer, Ferguson, and Furst were among

the founders of Full Tilt Poker, as well as part-owners of Tiltware, LLC, a California limited

liability Company that was the beneficial owner of all other Full Tilt Poker entities.  These Full

Tilt insiders owned the following approximate percentages of Tiltware LLC: Bitar (7.8%),

Lederer (8.6%), Ferguson (19.2%), and Furst (2.6%).  Each was also, at all relevant times, a

member of the Board of Directors of Tiltware LLC, and Ferguson was Chairman of the Board of

Directors.  At all relevant times Bitar and Lederer were the two managing members of Tiltware

LLC and Bitar was the CEO of Full Tilt Poker.  Lederer also served, at times, as the President of

Full Tilt Poker.  Lederer, Bitar, and Ferguson were also well known professional poker players.

86.     Rather than protect player funds as promised, Full Tilt Poker, through its

leadership including the Individual Defendants and by virtue of their self-interest and control

over LLC, distributed hundreds of millions of dollars to its owners. Beginning in April 2007 and

continuing through April 2011, Tiltware LLC's Board of Directors, to wit, the Individual

Defendants, authorized the distribution of approximately $443,860,530 to the owners of Tiltware

LLC, including themselves.  Many of the distribution payments were transferred from Full Tilt

Poker directly to bank accounts the professional poker players affiliated with Full Tilt Poker and other owners had established in Switzerland and other foreign countries.

87.     Defendant Bitar personally received at least approximately $41 million, including at least $34,454,781.53 in ownership distributions and at least an additional $6.5 million in "profit sharing" payments.  Defendant Lederer personally received at least approximately $42 million, including approximately $37,856,010.92 in ownership distributions and at least $4 million in "profit sharing" payments.  Defendant Ferguson was allocated approximately $85,161,305.88 in distributions. Tiltware records reflect that approximately $25 million of this sum was actually transferred to Ferguson's personal accounts, with the remaining balance characterized as "owed" to Ferguson.  Defendant Furst received at least $11,706,323.96 in distributions.

88.     The other approximately 19 owners of Tiltware LLC received the remainder of the approximately $443,860,530 distributed.

89.     These ownership distributions continued at a rate of approximately $10 million per month when, by at least the summer of 2010, Full Tilt Poker's management was aware that Full Tilt Poker was having difficulty collecting funds from U.S. player accounts.

90.     Beginning in or around August 2010, Full Tilt Poker was often unable to find payment processors to withdraw funds from the bank accounts of its United States players.  From this time, Full Tilt developed a shortfall of approximately $130 million owed to players.  The management of Full Tilt Poker, including the Individual Defendants, operated Full Tilt Poker with the hope that only a small number of players would try to withdraw funds at one time, and that Full Tilt Poker would regularly receive additional deposits in amounts greater than any withdrawal requests.

91.     This undisclosed backlog further exacerbated the already-existing discrepancy between the amount of "safe," secure," and "available" player funds that Full Tilt Poker represented to have on deposit, and the far smaller amount of funds that it actually maintained.

92.     As stated by U.S. Attorney Preet Bharara, "Full Tilt was not a legitimate poker company, but a global Ponzi scheme. Full Tilt insiders lined their own pockets with funds picked from the pockets of their most loyal customers while blithely lying to both players and the public alike about the safety and security of the money deposited."

**CAUSES OF ACTION**
**COUNT I - CONVERSION**

93.     Plaintiff repeats and realleges the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

94.     All Defendants, through their own unlawful actions as well as their ownership and control of the Full Tilt companies, are liable for conversion of Plaintiff's and class members' funds and property held in Plaintiff's and class members' Full Tilt Player Accounts. The Player Accounts and funds and property therein have been wrongfully retained by Defendants and remain in their exclusive custody.  Plaintiff and class members deposited and maintained property in their Full Tilt Player Accounts, and at all relevant times maintained the clear right to immediate possession of his or her property. At all relevant times, each Plaintiff's property has remained specifically identifiable within Full Tilt's system, because each Plaintiff's property is recorded as being in individual Player Account.  The same is true for all class members' property. The value of any monies, and the existence of other assets and their dollar values, within each Player Account is tracked and recorded by Full Tilt.

95.     At all relevant times, Defendants have remained under obligation to return the properties – or the dollar value of the properties – to Plaintiff and class members, upon demand.

Before April 15, 2011, Plaintiff and class members generally exercised their possessory interests in, and immediate rights to return of, their properties by making demand in the form of a request to "cash out."  Players cashed out by logging into their Player Accounts, navigating to a button on their screens entitled "cashier," selecting a withdrawal amount (in dollars), and selecting a method of withdrawal. When players made their requests to cash out, the Defendants' obligations to permit withdrawal of the desired balances were triggered.  Until April 15, 2011, Defendants generally complied with these obligations.

96.     Each listed Defendant has participated in the conversion of Plaintiff's and class members' funds.  Pocket Kings, Vantage, and Filco worked together to maintain the Full Tilt website.  By failing to allow Plaintiff and class members to access their funds through the website as promised, each blocked Plaintiff's and class members' access to the money in their accounts.

97.     Defendant Tiltware LLC participated in the conversion of Plaintiff's and class members' funds.  As Full Tilt's marketing wing, Tiltware LLC, helped to create and disseminate false statements made to Plaintiff and the Class regarding the "safety and security" of players' funds.  For example, Tiltware LLC Managing Members Bitar and Lederer advised a Full Tilt Poker employee that Full Tilt Poker could represent to players that Full Tilt Poker kept all of its player funds in segregated accounts and that funds would be available for withdrawal by players at all times.  ¶ 64.  Based on this information, Full Tilt Poker created several form e-mail templates used by Full Tilt Poker to respond to player inquiries about the security of their funds. ¶¶ 65-67.  Partly based on these statements, players continued depositing funds in their player accounts.

33

98.     The Individual Defendants participated in the conversion of Plaintiff's and class members' funds when, by virtue of their status as Full Tilt Poker insiders, their knowledge of Full Tilt's financial situation including problems processing transactions, and their control over corporate finances, made off with class members' funds in the form of purported "ownership distributions," "profit sharing distributions", personal loans, and other payments made at the expense of class members.

99.     The Individual Defendants also participated in the conversion of Plaintiff's and class members' funds because, as owners, Directors, and insiders of Tiltware LLC, Full Tilt's marketing wing, they oversaw the creation and dissemination of false statements made to Plaintiff and the Class regarding the "safety and security" of players' funds.  Additionally, the Insider Defendants, by virtue of their status as Full Tilt Poker insiders, their knowledge of Full Tilt's financial situation including problems processing transactions, and their control over corporate finances, made off with class members' funds in the form of purported "ownership distributions," "profit sharing distributions," personal loans, and other payments made at the expense of class members.

100.    Since April 15, 2011 and continuing at all relevant times since, Defendants have refused to honor Plaintiff's and class members' cash out requests.  While Defendants have paid lip service to the return of Plaintiff's and class members' funds, Defendants' ongoing intentional refusal to honor cash out requests, and/or conduct in converting such funds to their own personal accounts, is inconsistent with Defendants' obligations to Plaintiff and class members and plainly interferes with Plaintiff's and each class member's dominion over his or her property.

**COUNT II – VIOLATION OF 18 U.S.C. § 1964(c) AGAINST RICO DEFENDANTS**

101.    Plaintiff repeats and realleges the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

**THE ENTERPRISE**

102.    The Plaintiff and RICO Defendants named above in ¶¶ 17-25 are persons as defined by 18 U.S.C. 1961(3) of the Act.  The RICO Defendants and non-Defendant Full Tilt Companies, together, form an Enterprise ("Full Tilt Enterprise", or "Enterprise"), for purposes of the Act, as defined by 18 U.S.C. § 1961(4).  Each RICO Defendant is an owner, director, or principal of at least one Full Tilt Company, or is itself a Full Tilt Company, and all are members of the Enterprise.

103.    The Full Tilt Enterprise has a continuing and ongoing structure and functions as a continuing unit with established duties separate from the pattern of racketeering activity described below.

104.    The Enterprise engages in or affects interstate and foreign commerce because it conducts business in the United States and around the world through the Full Tilt website and through live events in the U.S. and abroad; the Enterprise also processes transactions from U.S. and overseas internet poker players, utilizing a number of entities headquartered in the United Kingdom, Aruba, the United States, and elsewhere, and holds accounts in banks around the world, including in the United States and in Switzerland.

105.    The Full Tilt Enterprise was created, and or used as a tool to effectuate a pattern of racketeering activity.  The purpose of the Enterprise was to process U.S. player funds for Full Tilt, and enrich the owners at the players' expense.  The RICO Defendants usurped the Enterprise and directed the Enterprise's foray into wire, bank fraud, and money laundering in order to derive profit for Full Tilt and for themselves from the U.S. market.

106.     Beginning in 2006 and continuing to the present, each RICO Defendant participated in the Enterprise's commission of the illegal acts. Specifically, RICO Defendants were in a position to conduct the affairs of the Enterprise, and did conduct the affairs of the Enterprise, through a pattern of illegal activity as described below.  Furthermore, the RICO Defendants were successful in their scheme, and did in fact commit illegal activity, including the predicate acts of bank fraud, wire fraud and money laundering offenses, in violation of 18 U.S.C. §§ 1343, 1344, and 1956.

**PREDICATE ACTS**

107.     Wire fraud, bank fraud, and money laundering are "racketeering offenses" under 18 U.S.C. § 1961(l).  As described below, the RICO Defendants committed the predicate acts of wire fraud, bank fraud, and money laundering.  Occurring within a ten year span of time, the RICO Defendants' actions, as described herein, constitute a "pattern of racketeering activity" as defined by the Act.  18 U.S.C. § 1961(5).

**WIRE FRAUD**

108.     The elements of wire fraud are 1) a scheme to defraud, and 2) use of interstate commerce in furtherance of the scheme. The statute reads, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343.

109.    The RICO Defendants engaged in an intentional scheme to defraud Plaintiff and class members through direct misrepresentations transmitted over the internet. Among other false promises, the RICO Defendants represented to Plaintiff, through the internet, an instrument of interstate commerce, that any money she deposited in Full Tilt Player Accounts would be safe and secure, would be processed through safe and secure processors, and could be withdrawn at her convenience, inducing reliance by Plaintiff.

110.    Specifically, and as described in more detail in ¶¶ 58-69 of this Complaint, Full Tilt falsely represented that

> If you're looking to get the most out of your online poker experience, Full Tilt Poker offers a wide selection of real money ring games and tournaments for your enjoyment.  What's more, Full Tilt Poker works hard to ensure that playing for real money is safe, easy, and secure by:
>
> - Providing a variety of safe and secure payment processors to make depositing money fast and easy.
> - Ensuring any money you have on deposit with Full Tilt Poker is safe and secure.
> - Protecting your valuable personal information.
> - Processing withdrawals quickly and efficiently.

111.    Another Full Tilt webpage, entitled "Security", stated:

> Full Tilt Poker conducts their banking and financial affairs in accordance with generally accepted standards of internationally recognized banking institutions. Full Tilt Poker follows and adheres to applicable laws

pertaining to transaction reporting and anti-money laundering laws and regulations.

112.   These material misrepresentations, made to millions of U.S. residents, including residents of New York were made through the fulltiltpoker.com website at all or some relevant times. The purpose of these representations was to convince U.S. residents to deposit funds, which the Enterprise would then fraudulently process and illegally launder, unbeknownst to the depositors.

113.   As a result of these and other misrepresentations (and the other acts of racketeering activity alleged herein), Plaintiff and other class members deposited their funds in Full Tilt Player Accounts to which they now have no access.  As just one example, Plaintiff deposited approximately $600 dollars to her player account in June of 2008.

## BANK FRAUD

114.   18 U.S.C. § 1344 provides, in relevant part, for criminal penalties for whoever knowingly executes or attempts to execute, a scheme or artifice to 1) defraud a financial institution, or 2) obtain any funds by means of false or fraudulent pretenses, representations or promises.

115.   The RICO Defendants are guilty of bank fraud on both counts.  As described in more detail in ¶¶ 47-49 of this Complaint, the RICO Defendants committed bank fraud by purposefully defrauding a number of financial institutions, including federally insured institutions, by ensuring that the gambling code that merchant banks were required to attach to gambling related transactions was omitted from the transaction information sent to issuer banks, and by lying to banks to open accounts under the names of phony merchants, in order to process gambling related funds that the banks otherwise would not have touched.

116.     The RICO Defendants, through the wires, defrauded U.S. banks by: establishing the scheme to set up merchant accounts in offshore banks in fake names; contracting with third party e-check processors and directly or indirectly instructing that they open merchant accounts under phony names at U.S. Originating Depository Financial Institutions ("ODFIs") to gain access to the ACH system; directing that websites be created to cover up the fact that the Full Tilt Enterprise had made up phony companies in order to trick U.S. financial institutions into helping it process U.S. poker players' online poker transactions; and omitting the gambling code from each transaction in furtherance of this scheme.

117.     As a result of this intentional nondisclosure and misrepresentations and other acts of racketeering activity alleged herein, the RICO Defendants defrauded the banks involved and obtained funds from Plaintiff and other class members, through these banks, that they would not have been able to gain access to but for these unlawful acts.  Plaintiff and other class members now have no access to these funds.

## MONEY LAUNDERING

118.     The RICO Defendants have also violated the federal money laundering statute 18 U.S.C. § 1956.   RICO Defendants committed and/or conspired to commit money laundering pursuant to all three sections of the statute. First, the RICO Defendants knowingly conducted financial transactions which involved the proceeds of wire fraud and bank fraud, perfectly aware that the transactions they carried out—including the routing of the funds through fake merchants— were designed to "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Second, the RICO Defendants purposefully transferred U.S. player funds, deposited in the United States, to offshore banks, in order to have the funds processed pursuant to the eCheck wire fraud in which

Defendants participated.  Defendants purposefully transferred U.S. player funds, deposited in the United States, to offshore banks, in order to have the funds processed pursuant to the eCheck wire fraud in which Defendants participated.  Finally, the RICO Defendants intended to conceal the truth about the transactions at issue and have used the proceeds thereof to continue funding the Enterprise's illegal activities, including paying off third party processors at a higher than market rate to facilitate their deceitful scheme to get U.S. banks to process Full Tilt's gambling related transactions through the ACH.

### INSTANCES OF WIRE FRAUD, BANK FRAUD, AND MONEY LAUNDERING

119.    RICO Defendants committed wire and bank fraud and money laundering in connection with the following deposits and withdrawals in a U.S. player's account through the Fulltiltpoker.com website. Defendants are culpable as actors or as persons who, upon information and belief, caused the following acts to be committed according to the Department of Justice's Civil Complaint, attached:

a)      Between at least 2006 and March 2011, the RICO Defendants relied on (and handsomely compensated) third party payment processors, to whom Defendants handed over U.S. player funds. The third party processors, who lied to the U.S. banks about the transactions they were processing. With the third party payment processors, the Enterprise deceived U.S. banks and financial institutions into unknowingly processing millions of dollars in funds for Full Tilt Poker.

b)      Specifically, on March 30, 2010, a U.S. resident ("Doe") requested a deposit of $30 via eCheck, from his personal bank account in New York, and that sum was accepted and deposited into Doe's account. The transaction was processed through a sham company, under that fictitious entity's name. The fake company established a processing account with a U.S.

bank (a U.S. based "ODFI" or "Originating Depository Financial Institution"), in order to process the funds through ACH, which is only available for transactions with an ODFI on both sides.

c)      On March 31, 2010, Doe requested deposit of $100 using a Visa card, and that sum was also accepted and deposited into Doe's account. The transaction was processed through a sham company, which deceitfully initiated the credit card charges by setting up and using an offshore bank account.  The transaction was processed without the required gambling code, resulting in the extension of credit for a transaction that would otherwise be instantly denied. The credit card transactions appeared to be initiated entities that were completely unrelated to the Enterprise. In reality, these entities were no more than temporary disguises with which the Enterprise shrouded credit card transactions to and from U.S. players.

d)      Between March 30, 2010 and November 15, 2010, Doe made upwards of 50 deposit requests, via credit card and eCheck, into his player account and all were accepted. As a practical matter, it was not possible for an eCheck or Visa card transaction to be processed in any manner other than through the frauds described, since banks would not process the funds or hold an account for a known Full Tilt entity.

e)      Between March of 2010 and March of 2011, Doe also made withdrawal requests. Doe's funds were paid by automated credit or by paper check; however the payments to Doe were not made in the name of any known entity associated with Full Tilt Poker. Instead, the payments to Doe came from accounts under the names of "Arrow Checks," "TLC Global," and "Eastern Expressions," among others.

120.    "Arrow Checks", "TLC Global," and "Eastern Expressions" are just some of the sham companies that the Enterprise set up pursuant to the wire fraud, bank fraud and money

laundering operations it ran. These are conspiracies to commit, and commissions of, indictable acts constituting "racketeering activities" pursuant to that term's definition by the RICO Act.  18 U.S.C. § 1961(1).

121.    The RICO Defendants' racketeering activities, described herein, were committed through the conduct of the affairs of the Enterprise, and violated 1962(c) and (d) directly and proximately resulted in the injury complained of herein – the freezing of U.S. Player Accounts (including Plaintiff's) by Full Tilt.

122.    Through the RICO Defendants' racketeering activities and/or their participation in a conspiracy that constitutes racketeering activity, the RICO Defendants' violated 1962(c) through their commission of the activity, and violated 1962(d) by conducting the affairs of an enterprise through a conspiracy to commit the frauds described above.

123.    The RICO Defendants directly and proximately caused the acceptance of U.S. player deposits under circumstances that the RICO Defendants knew could lead to the collapse and seizure of Full Tilt, or other interference with Full Tilt's obligation to make account holders' funds available.

124.    Accordingly, Plaintiff and the class members are entitled, under 1964(c), to threefold the damages they have sustained and the cost of the suit, including a reasonable attorney's fee.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of herself and the proposed Class as follows:

A.  For an order certifying the Class herein under Federal Rule of Civil Procedure 23 and appointing Plaintiff and her undersigned counsel to represent said Class under Federal

Rule of Civil Procedure 23(g);

B.  For a declaration that each Defendant has violated 18 U.S.C. § 1962(c) and §1962(d);

C.  For an order enjoining the Defendants from continuing to block Plaintiff and class members' access to their Full Tilt Player Accounts;

D.  For an order demanding that the Defendants refund Plaintiff and class members the full value of the assets, funds, monies and other property in their Player Accounts before seizure of Full Tilt's assets by the Department of Justice, plus interest as provided by applicable law;

E.  For an order demanding that Defendants pay to each Plaintiff and class member threefold the damages sustained, as determined by the Court;

F.  For an order awarding costs and reasonable attorney fees  pursuant to 18 U.S.C. § 1964(c); and

G.  For such other and further relief as this Court may determine to be just and necessary.


**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  March 12, 2012                                     Respectfully submitted,

                                                          **WOLF POPPER LLP**

                                                          By: _____
                                                               LESTER L. LEVY

                                                          Lester L. Levy (LL9956)
                                                          Robert S. Plosky (RP7829)
                                                          845 Third Avenue, 12th Floor
                                                          New York, NY 10022
                                                          (212) 759-4600

                                                          *Local Counsel*

Mila F. Bartos
Stan M. Doerrer
FINKELSTEIN THOMPSON LLP
1050 30th St. NW
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
mbartos@finkelsteinthompson.com
sdoerrer@finkelsteinthompson.com

Geoff Herzog, Esq.
LAW OFFICES OF GEOFFREY G.
HERZOG
208 21st Ave., South.
Jacksonville Beach, FL. 32250
gherzog@me.com

*Attorneys for Plaintiff*