UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KRISTIN LAWSON, individually and on behalf         :
of all others similarly situated,
                                 Plaintiff,                     :
           v.                                                                                      11 Civ. 6087 (KMW) (KNF)
                                                        :
FULL TILT POKER LTD., TILTWARE LLC,                                   **Order & Opinion**
VANTAGE, LTD., FILCO LTD.,                                     :
KOLYMA CORP. A.V.V., POCKET KINGS, LTD.,
RANSTON LTD., MAIL MEDIA LTD.,                           :
RAYMOND BITAR, HOWARD LEDERER,
CHRISTOPHER FERGUSON, RAFAEL FURST,                :
and JOHN DOES 1-10,
                                 Defendants.            :
------------------------------------------------------------------------X
KIMBA M. WOOD, U.S.D.J.:

       Defendants Full Tilt Poker Ltd. ("Full Tilt"), Tiltware LLC, Vantage Ltd., Filco Ltd., Kolyma Corp. A.V.V., Pocket Kings Ltd., Ranston Ltd., and Mail Media Ltd. (collectively, the "Corporate Defendants"), and Raymond Bitar ("Bitar"), Howard Lederer ("Lederer"), Christopher Ferguson ("Ferguson"), and Rafael Furst ("Furst") (collectively, the "Individual Defendants") have moved, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), to dismiss the claims asserted by Plaintiff Kristin Lawson ("Lawson") on behalf of herself and a purported nationwide class. [Dkt. No. 41]. Lawson seeks to represent a class of U.S. residents who, on April 15, 2011, "held real-money Full Tilt Poker Player Accounts and who were owed money by Full Tilt." (Amended Compl. ¶ 34 (the "AC")) [Dkt. No. 32].

       The AC asserts a claim against all Defendants for conversion of funds held in the player accounts. The AC also asserts a claim under 18 U.S.C. § 1964(c) of the Racketeer Influence and Corrupt Organizations Act ("RICO"), alleging that certain Defendants (the "RICO Defendants") conspired and engaged in a pattern of bank fraud, wire fraud, and money laundering.

1

For the reasons that follow, Defendants motion to dismiss is GRANTED in part, and DENIED in part.

I.  BACKGROUND

The following facts are drawn from the AC, and are accepted as true for purposes of this motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A.  **Federal Action Against Online Poker**

In the late 1990s, various companies began providing online forums for individuals to play poker with real money.  In the ensuing decade, Internet poker drew about 15 million Americans to bet an estimated $30 billion per year.  (AC ¶ 2).  By 2004, the industry had made an estimated $1 billion in profits.  (*Id.*).

In 2006, Congress enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-5367, which made it a federal offense for gambling businesses to "knowingly accept" most forms of payment "in connection with the participation of another person in unlawful Internet gambling."  *See* 31 U.S.C. § 5361.  In light of UIGEA, certain U.S. banks began prohibiting online poker businesses from opening bank accounts if the businesses intended to engage in Internet-gambling transactions with U.S. customers.  (AC ¶ 3).  In light of these prohibitions, some online poker providers terminated their U.S. operations.  (*Id.*).  Others, including Full Tilt, continued to operate, and allegedly devised a scheme to deceive U.S. banks into once again processing gambling transactions from U.S. players.  (*Id.* ¶ 4).  As a result, Defendants continued to collect money from U.S. players.  As of April 2011, Full Tilt held approximately $150 million of U.S. player funds.  (*Id.* ¶¶ 1, 6).

On April 15, 2011, known as "Black Friday" in the online gambling world, the United States Attorney for the Southern District of New York shut down the websites of the three largest

online poker companies operating in the United States, including Full Tilt, seized their assets, and issued arrest warrants for their founders. (*Id.* ¶ 9). An ensuing criminal indictment accused various defendants of multiple UIGEA violations, conspiracy to commit bank and wire fraud, and conspiracy to commit money laundering. *See United States v. Scheinberg,* S3 No. 10 Cr. 336 (S.D.N.Y. Apr. 14, 2011) (Kaplan, J.) [Cr. Dkt. No. 20]. Soon after the indictment, the Department of Justice ("DOJ") filed a civil suit seeking *in rem* forfeiture of defendants' assets and any proceeds derived from their illegal acts. *See United States v. Pokerstars*, No. 11 Civ. 2564 (S.D.N.Y. Sept. 21, 2011) (Wood, J.) ("*Pokerstars* Compl.") [*Pokerstars* Dkt. No. 53]. The suit also sought monetary judgments from each of the Individual Defendants.

Lawson claims that since these actions, and despite Full Tilt's agreement with the DOJ "to facilitate the repatriation of U.S. players' funds," Full Tilt has not permitted U.S. players to cash out of their Full Tilt accounts. (AC ¶¶ 12-13).

## B. Subsequent Private Actions

A number of civil lawsuits have subsequently been filed by and on behalf of online poker players who cannot access the funds in their Full Tilt accounts.

### i. *Segal v. Bitar*

On June 30, 2011, private plaintiffs filed a putative class action seeking recovery of approximately $150 million that they claimed was "locked up" in Full Tilt player accounts. *Segal v. Bitar*, No. 11 Civ. 4521, 2012 WL 273609, at *2 (S.D.N.Y. Jan. 30, 2012) (Sand, J.) (citing *Segal* Compl. ¶ 42). The *Segal* complaint asserted both a conversion and a RICO claim, and named both corporate and individual defendants. *Id.* at *1. The *Segal* defendants moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. *Id.* at *2. District Judge Leonard B. Sand granted the motion in part. Judge Sand determined that the *Segal*

plaintiffs failed to establish personal jurisdiction over the individual defendants and also lacked standing pursue their RICO claim. *Id.* at *6-8, *10-13. The court did, however, uphold the conversion claim with respect to the corporate defendants. *Id.* at *8-10.

### ii. *The Instant Action*

Two months after the *Segal* plaintiffs filed their complaint, Plaintiff Kristin Lawson, a Minnesota resident, filed the instant action. (Original Compl.) [Dkt. No. 1]. Lawson's allegations overlapped substantially with those asserted in *Segal*. After Judge Sand adjudicated the motion to dismiss in *Segal*, Lawson sought leave to file an amended complaint. [Dkt. No. 22]. Following briefing, the Court granted Lawson's motion, [Dkt. No 31], and Lawson filed the AC on March 13, 2012.

The AC maintains many parallels with *Segal*. For example, as in *Segal*, the AC asserts that Defendants wrongfully froze "approximately $150 million in players' funds." (AC ¶ 9). The AC also asserts both a conversion claim and a RICO claim. The conversion claim stems from the freezing of Full Tilt player accounts. The RICO claim alleges that Defendants engaged in an unlawful enterprise designed to avoid the financial controls spurred by UIGEA by, *inter alia*, (1) directing third-party processors to apply fake codes to credit card gambling transactions, (2) creating sham merchant and e-commerce websites that would not be easily associated with online poker, and (3) using false codes and sham companies in processing e-checks. (*See id.* ¶¶ 53-57). Lawson also contends that the RICO Defendants misrepresented the security of player accounts, (*id.* ¶¶ 110-113), and concealed and laundered the proceeds of their scheme by through offshore banks, (*id.* ¶ 118).

Although most of the allegations in the AC are the same as the *Segal* allegations, there are some important differences. In light of Judge Sand's determination that the *Segal* plaintiffs

failed to establish jurisdiction over the individual defendants, the AC names only four individuals—Bitar, Lederer, Ferguson, and Furst.  These Individual Defendants are alleged to be among the founders of Full Tilt, as well as part owners of a Tiltware, LLC, a California-based parent company.  (*Id.* ¶ 85).  These are also the same four individuals against whom the Government seeks recovery in the *Pokerstars* civil action.  The AC also alleges that each of these individuals received millions of dollars in personal payments out of player funds.  (*Id.* ¶¶ 26-29).

      Defendants have now moved to dismiss the AC on many of the same grounds as asserted in *Segal*.  [Dkt. No. 41].  Like *Segal*, this matter was originally assigned to the Honorable Leonard B. Sand.  On November 29, 2012, it was transferred to the undersigned.  [Dkt. No. 56].

## II.     STANDARD OF REVIEW

      In reviewing a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  To survive a motion to dismiss, a plaintiff must make factual allegations sufficient to "'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. 544, 570 (2007).  Although a court accepts factual allegations as true for the purposes of a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal,* 556 U.S. at 678.  In evaluating a motion to dismiss, a court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

      Plaintiff bears the burden of establishing the court's jurisdiction over the defendants.  *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566-67 (2d Cir.1996).  At this early

stage, prior to discovery, "plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant." *Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 126 (2d Cir. 2008). In evaluating whether plaintiffs have made a prima facie showing, the court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.*

### III. DISCUSSION

#### A. Personal Jurisdiction

The Individual Defendants, who are not residents of New York, contend that the Court lacks personal jurisdiction over them. Lawson counters that the Court has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), which grants the Court jurisdiction over any defendant reached by New York's long-arm statute, N.Y. C.P.L.R. § 302(a). Section 302(a) provides that New York courts shall have personal jurisdiction over any defendant who

> 1. transacts any business within the state or contracts anywhere to supply goods or services to the state . . . [or]
>
> 3. commits a tortious act without the state causing injury to person or property within the state [and] . . .
>
>> ii. expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y. C.P.L.R. § 302(a). Lawson contends that the Court has jurisdiction pursuant to both § 302(a)(1) and § 302(a)(3)(ii), and that such jurisdiction comports with due process.

##### 1. *Jurisdiction Under § 302(a)(1)*

To determine whether jurisdiction exists under § 302(a)(1), the Court must decide "(1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239,

6

246-51 (2d Cir. 2007) (quoting N.Y. C.P.L.R. § 302(a)).  A nonresident "transacts business" in New York when he "purposefully avails [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (quoting *McKee Elec. Co. v. Rauland-Borg Corp.*, 229 N.E.2d 604, 607 (N.Y. 1967)).  A cause of action arises from such a business transaction when there is "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."  *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998).

In *Segal*, Judge Sand held that the court lacked jurisdiction under § 302(a)(1) because the plaintiffs alleged merely that the individual defendants "played poker games against New York consumers on the website," and "helped promote the brand by playing live poker games that were broadcast into New York."  *Segal*, 2012 WL 273609, at *6.  These allegations were insufficient to establish jurisdiction because plaintiffs' conversion claim did not "arise out of" defendants' participation in such poker games.  *Id.*

Here, Lawson renews the argument that the Individual Defendants transacted business in New York by playing online poker against New York residents.  (*See* Pl.'s Mem. 31 (citing Doerrer Decl. ¶¶ 5-17)).[1]  In order to cure the defect identified in *Segal*, Lawson adds that Full Tilt's website "specifically touted the ability to play online poker versus Defendants."  (*Id.*

---

[1] Defendants oppose the Court's consideration of the Doerrer Declaration.  The case law cited by Defendants, however, concerns a court's ability to look beyond the complaint on a motion made pursuant to Rule 12(b)(6), not Rule 12(b)(2).  Although it is well settled that in adjudicating a 12(b)(6) motion, courts are limited to the complaint, exhibits, and matters of judicial notice, *see Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088, 1092 (2d Cir. 1995), it is equally well settled that courts may look outside the complaint when adjudicating a 12(b)(2) motion.  Courts may determine whether a prima facie case of jurisdiction exists by considering both the plaintiff's pleadings and also any "affidavits and supporting materials."  *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) ("A plaintiff can make [a prima facie showing of jurisdiction] through his own affidavits and supporting materials containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." (citation, alterations, and quotation marks omitted)).  In accord with these decisions, the Court considers the factual averments in the Doerrer Declaration for purposes of determining whether Lawson has made the required prima facie showing.

(citing Doerrer Decl. ¶¶ 3-4)).  This additional statement, however, fails to tie Defendants' New York business to Lawson's conversion claim.  Although the Individual Defendants' online games may have encouraged consumers to use Full Tilt, these games have no direct relation to the freezing of player accounts years later—the basis for the conversion claim.  Thus, even assuming that playing online poker against New York consumers constitutes transacting business in the state, Lawson's conversion claim does not "arise out of" this business.

Lawson further attempts to satisfy § 302(a)(1) by alleging that Bitar and Lederer instructed Full Tilt employees to represent to consumers, through Full Tilt's website, that player funds were kept in segregated accounts and available for withdrawal at any time.  (*See* Pl.'s Mem. 30-31 (citing AC ¶¶ 60-62, 64-68)).  This allegation alone, however, does not establish that these Individual Defendants "maintained or operated" the Full Tilt website.  An individual who operates or maintains a comprehensive service website targeted at New York state consumers will meet the "transacts business" requirement.  *See, e.g.*, *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170-71 (2d Cir. 2010); *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565-66 (S.D.N.Y. 2000) (Sweet, J.).  But Lawson has cited no authority that approval, on one or two occasions, of a limited amount of content on a website amounts to "operating or maintaining" that website.  To "operate or maintain" requires far more consistent interactions than the tangential relationship presented in this case.

Accordingly, the Court lacks jurisdiction under § 302(a)(1).

### 2.     *Jurisdiction Under § 302(a)(3)(ii)*

Although the Court reaches the same result as *Segal* with respect to § 302(a)(1), the Court finds that it does have jurisdiction under § 302(a)(3)(ii).

To establish jurisdiction under § 302(a)(3)(ii), a plaintiff must demonstrate that: "(1) the defendant's tortious act was committed outside New York, (2) the cause of action arose from that act, (3) the tortious act caused an injury to a person or property in New York, (4) the defendant expected or should reasonably have expected that his or her action would have consequences in New York, and (5) the defendant derives substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 640 F.3d 497, 498-99 (2d Cir. 2011). Judge Sand found that the *Segal* plaintiffs failed to meet the first element of this jurisdictional test. *See Segal*, 2012 WL 273609, at *7.

In contrast, the Court finds that in this case Lawson has indeed stated a "colorable cause of action" sufficient to satisfy the first element of § 302(a)(3)(ii). *See Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,* 450 F.3d 100, 106 (2d Cir. 2006). In particular, Lawson alleges that Full Tilt commingled player funds with its own operational funds and used these combined funds to compensate the Individual Defendants with millions of dollars in "ownership distributions," "profit sharing payments," and other payments.[2] (AC ¶¶ 6, 26-29, 32, 41, 60). These payments allegedly began in 2007 and continued through 2011 even though Full Tilt's management was aware that it was "having difficulty collecting funds from U.S. player accounts." (*Id.* ¶¶ 86, 89). As a result, by April 2011, Full Tilt owed approximately $390 million to players around the world but had less than $60 million on hand. (*Id.* Ex. A ¶ 99 (*Pokerstars* Compl.)). Absent this "looting," Full Tilt would have been able to return player funds under its agreement with the DOJ. (*Id.* ¶ 32; *see also id.* ¶¶ 70-71, 75-76). Viewed in the light most favorable to Lawson, the Court finds that these additional allegations state a colorable claim for conversion.

---

[2] Lawson alleges that Bitar received "$34,454,781.53 in ownership distributions and at least $6.5 million in 'profit sharing' payments," that Lederer received "approximately $37,856,010.92 in ownership distributions and at least $4 million in 'profit sharing' payments," that Ferguson "allocated approximately $85,161,305.88 in distributions" and received "$25 million of this sum", and that Furst "personally was allocated approximately $11,706,323.96 in distributions" and transferred a portion. (AC ¶¶ 26-29).

9

Lawson also satisfies the second element—that the cause of action at issue "arose" from the Individual Defendants' tortious acts. In order to meet this element of the jurisdictional test, the out of state act "must be 'so close to the injury that reasonable people would regard it as a cause of the injury.'" *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008) (Chin, J.). The AC alleges that the conversion of player funds occurred on or after April 15, 2011, when customers were barred from withdrawing money from their accounts. Although the Individual Defendants are not alleged to have personally participated in blocking access to the accounts, the AC alleges that the Individual Defendants took millions of dollars of player funds. Lawson alleges that because of these personal payments, Full Tilt is now unable to "return player funds under its agreement with the Department of Justice." (AC ¶ 32; *see also id.* ¶¶ 70-71, 75-76). The conversion claim thus arose out of the tortious conversion of player funds.

Third, the Court finds that Lawson has established that the tortious acts "caused an injury to a person or property in New York." *See Penguin Grp.*, 640 F.3d at 498-99. The AC alleges that Defendants obtained the contact information of New York poker players, contracted with these players regarding Full Tilt's software, and maintained accounts funded by these New York residents on behalf of these players. (*See* AC ¶ 40; *id.* Ex. A ¶ 50(b). The AC also discusses numerous banking transactions between Full Tilt and personal bank accounts in New York. (*Id.* ¶ 119; *id.* Ex. A ¶¶ 70, 73). Lawson has also attached an affidavit detailing online poker games played by Individual Defendants against New York residents. (Doerrer Decl. ¶¶ 5-17). Accordingly, given that Full Tilt clearly reached New York residents, this element is satisfied.

Fourth, the Individual Defendants should reasonably have expected that their actions would have consequences in New York. *See Penguin Grp.*, 640 F.3d at 498-99. "The test of whether a defendant expects or should reasonably expect his act to have consequences within the

10

State is an objective rather than subjective one." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999) (internal quotation marks omitted).  There can be no dispute that the Individual Defendants should have been aware that Full Tilt, as an interactive website operating nationwide, allowed New York residents to fund their Full Tilt accounts while in the State and to play online poker from their New York residences.  *See Segal*, 2012 WL 273609, at *5.  As such, Defendants should have expected that commingling player funds with Full Tilt funds and taking millions of dollars in personal payments would have consequences in New York.

Finally, the Individual Defendants certainly "derive[d] substantial revenue from interstate or international commerce."  *Penguin Grp.*, 640 F.3d at 498-99.  "No specific dollar threshold is required for the revenue to be deemed substantial, and the main concern is the overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums."  *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 242 (S.D.N.Y. 2010) (Baer, J.) (internal quotation marks omitted).  The Individual Defendants took millions of dollars in personal profits from Full Tilt.  (*See* AC ¶¶ 26-29).  Given the global scale of Full Tilt's online operation, (*see id.* ¶¶ 76, 104), these profits were surely derived from interstate and international commerce.

The Court thus concludes that Lawson has made a prima facie showing that the Court has personal jurisdiction over the Individual Defendants under § 302(a)(3)(ii).

### 3.   *Whether the Exercise of Jurisdiction Comports with Due Process*

The Court also holds that this exercise of personal jurisdiction satisfies due process.  *See Chloé*, 616 F.3d at 164.  This due process analysis "consist[s] of two components: the 'minimum contacts' test and the 'reasonableness' inquiry."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).

11

The first of these tests asks whether the defendant "has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quotation marks omitted). Where a claim "arises out of, or relates to, the defendant's contacts with the forum, i.e., [specific jurisdiction,] . . . the required minimum contacts exist where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

The Individual Defendants' contacts with New York are numerous. As founders, board members, and shareholders of Full Tilt, the Individual Defendants benefited from Full Tilt's New York player accounts, the banking transactions from personal bank accounts located in New York, and the advertisements and high stakes poker matches directed at New York residents. (AC ¶¶ 40, 119; *id.* Ex. A ¶¶ 50(b), 70, 73). Full Tilt's website, which was accessible to New York residents, misled residents into believing their funds were kept in segregated accounts, (*see id.* ¶¶ 64-68), and also invited residents to play against poker professionals, (*see* Doerrer Decl. ¶¶ 3-4). Indeed, Lederer, Ferguson, and Furst utilized Full Tilt to play against New York residents on numerous occasions. (*See id.* ¶¶ 6-17 (detailing twelve instances)). Although merely maintaining a website is not necessarily sufficient, "[m]any courts have permitted the exercise of personal jurisdiction based on a defendant's interactive website in combination with other relevant forum contacts," *Gucci Am.*, 721 F. Supp. 2d at 245; *see also Best Van Lines*, 490 F.3d at 252 (holding that a website's interactivity "may be useful" for analyzing personal jurisdiction). The allegations in this case more than meet this standard, and thus establish that the Individual

Defendants purposefully availed themselves of doing business in New York and should have foreseen being haled into court here.  See *Chloé*, 616 F.3d at 171.

The second part of the due process analysis asks "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case."  *Bank Brussels*, 305 F.3d at 129 (quoting *Metro. Life*, 84 F.3d at 568).  Courts are to consider five factors in evaluating reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Metro. Life*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113-14 (1987); *Burger King Corp.*, 471 U.S. at 476-77).

The reasonableness of the Court's exercise of jurisdiction is clear.  Each of the Individual Defendants is already party to the *Pokerstars* proceeding (the Government's civil forfeiture and *in rem* action) currently pending before this Court.  The additional burden resulting from having to litigate this action will thus be limited.  Likewise, Lawson's interest and the interstate judicial system's interest weigh strongly in favor of resolving the instant dispute in the same forum as the Government's related proceedings.

Accordingly, the Court finds that the exercise of personal jurisdiction over the Individual Defendants comports with due process.

### B. Merits

Having established the Court's jurisdiction, the Court now turns to Defendants' motion to dismiss pursuant to Rule 12(b)(6).

### *1.    Conversion*

The Individual Defendants contend that the AC fails to state a claim for conversion. To state a claim for conversion under New York law, "a plaintiff must show legal ownership of, or a superior possessory right in, the disputed property, and that the defendant exercised an unauthorized dominion over that property." *Middle East Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir.1987) (internal quotation mark omitted)). The plaintiff must also allege that "the property subject to conversion is a specific identifiable thing." *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009) (Lynch, J.). Although plaintiffs who bring conversion claims against multiple defendants are not required to specify "which defendant received, has possession of the funds, or . . . has or had the power to return the funds," *Louros v. Cyr,* 175 F. Supp. 2d 497, 515 (S.D.N.Y. 2001) (Preska, J.)), plaintiffs must show "that each individual defendant . . . played some role" in the conversion. *Segal*, 2012 WL 273609, at *9-10 (quoting *Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219-20 (S.D.N.Y. 1997) (Chin, J.)).

The Court concludes that Lawson has adequately alleged a claim for conversion against the Individual Defendants. First, Lawson has alleged "a superior possessory right" in the funds contained in her Full Tilt account. (AC ¶ 17). These funds are also sufficiently identifiable to serve as the basis for a conversion claim. *See, e.g.*, *Newbro v. Freed*, 409 F. Supp. 2d 386, 394-95 (S.D.N.Y.2006) (Castel, J.); *Payne v. White*, 101 A.D.2d 975, 976 (N.Y. App. Div. 1984). Further, Lawson has alleged an act of "unauthorized dominion" in that she has been denied access to her accounts.

Finally, Lawson has alleged that each Individual Defendant played at least some role in the conversion by taking huge personal payments out of player funds. "When funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes

14

conversion." *Krasner v. Rahfco Funds LP*, No. 11 Civ. 4092, 2012 WL 4069294, at *7 (S.D.N.Y. Aug. 9, 2012) (Briccetti, J.) (citing *Hoffman v. Unterberg*, 9 A.D.3d 386 (N.Y. App. Div. 2004)); *see also Kohler v. Errico*, No. 09 Civ. 7290, 2011 WL 1077722, *6 (S.D.N.Y. Feb. 23, 2011) (Eginton, J.) (same). The AC alleges that the Individual Defendants received millions of dollars in personal disbursements out of player funds, which Defendants assured were kept in segregated accounts, but in fact were improperly commingled with Full Tilt's operational funds. Given that conversion "does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another," *LoPresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997), the Court concludes that Lawson has sufficiently alleged a conversion of player funds intended for a specific purpose. These allegations are sufficient to state a claim for conversion against the Individual Defendants.

### 2. Civil RICO

The RICO Defendants challenge Lawson's RICO claim on a number of grounds. The Court concludes that Lawson lacks standing to assert her RICO claim.

Under § 1964(c), a plaintiff will have standing to assert a RICO claim if she was injured in her business or property "by reason of a violation of" the RICO statute. 18 U.S.C. § 1964(c). An injury occurs "by reason of" a RICO violation when the illegal acts are a proximate cause of a plaintiff's injury. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Proximate cause, in turn, requires "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (quoting *Holmes,* 503 U.S. at 268-69); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (noting the only compensable injury flowing from a RICO violation is the harm caused by the racketeering acts). The Supreme Court has explained that a proximate relationship

between the RICO violation and the injury is required because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269.

In *Segal*, Judge Sand concluded that the plaintiffs had not demonstrated that the alleged racketeering activities were the proximate cause of their injuries. *Segal*, 2012 WL 273609, at *11-12. The Court reaches the same conclusion in this case.

Lawson's RICO claim alleges, *inter alia*, that the RICO Defendants misrepresented the safety and security of player funds, omitted gambling codes from various transactions so that merchant banks would continue to process gambling transactions, created sham merchant and e-commerce websites, and transferred player funds to offshore banks. (AC ¶¶ 110, 115, 118). According to Lawson, these actions were part of an enterprise designed to process U.S. player funds following the passage of UIGEA. (*Id.* ¶ 105).

The Court concludes that these racketeering activities were not the proximate cause of Lawson's injury—her inability to access the funds in her Full Tilt account. The racketeering activities allowed Full Tilt to continue to operate in the United States, but only after these racketeering activities came to public light, following the Government's civil and criminal actions, did Full Tilt freeze the player accounts. "[T]he Second Circuit has held on multiple occasions that harms caused by the exposure of defendants' racketeering activity, rather than by the activity itself, do not vest private plaintiffs with standing to sue under § 1964(c)." *Segal*, 2012 WL 273609, at *12 (citing *McBrearty v. Vanguard Grp., Inc.*, 353 Fed. App'x 640, 642 (2d Cir. 2009) (denying standing where injuries were "not the direct result of the RICO violation—the owning and/or financing of illegal gambling—but rather [were] the result of the subsequent 'government crackdown' on the illegal gambling"); *Lewis ex rel. Am. Express Co. v. Robinson*

16

*(In re Am. Express Co. S'holder Litig.)*, 39 F.3d 395, 400 (2d Cir. 1994) (denying standing where injuries were caused by the public exposure of alleged RICO violations, rather than the RICO violations themselves)). The Government shutdown of Full Tilt's website and Full Tilt's subsequent decision to freeze player accounts were intervening causes between the racketeering activities and the asserted injuries. *See, e.g.*, *Makowski v. United Broth. of Carpenters & Joiners of Am.*, No. 08 Civ. 6150, 2010 WL 3026510, at *8 (S.D.N.Y. Aug. 2, 2010) (Crotty, J.) ("When factors other than the defendant's RICO violation 'are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.'"); *Oak Beverages, Inc. v. Tomra of Mass., L.L.C.*, 96 F. Supp. 2d 336, 343 (S.D.N.Y. 2000) (McMahon, J.) (same).

Lawson attempts to cure this deficiency by alleging that, as a result of the racketeering activities, player funds were doomed *prior* to the Government's actions. (Pl.'s Mem. 9 (citing AC ¶¶ 67-73)). The *Segal* plaintiffs asserted this same theory of causation, and yet Judge Sand found that the plaintiffs lacked standing. (*Segal* Compl. ¶¶ 67-69, 91 (discussing defendants scheme to "evade" the restrictions following UIGEA without alerting players of the associated risks)). Furthermore, by asserting that player funds were doomed at some point prior to the Government's actions, but not providing a precise date or marker, Lawson does not provide the Court with any way "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269.

Finally, the Court finds that normative considerations do not weigh in Lawson's favor. *See Segal*, 2012 WL 273609, at *12. Where "the Government is independently prosecuting the racketeering offense," and Lawson has a "viable state common law claim for conversion," there is "no need to grant . . . the right to seek to recover treble damages" under RICO. *Id.*

Accordingly, the Court finds that Lawson lacks standing to assert her civil RICO claim.

## IV. CONCLUSION

For the aforementioned reasons, Defendants' motion to dismiss is GRANTED in part, and DENIED in part. [Dkt. No. 41].

SO ORDERED.

DATED:    New York, New York
             March 6, 2013

/s/_____
KIMBA M. WOOD
United States District Judge